IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

| | |
|---|---|
| V. CHARLES DONNELLY, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> BRANCH BANKING AND TRUST COMPANY, <br><br> Defendant. | Civil Action No. AW-13-852 |

## **MEMORANDUM OPINION**

Pending before the Court is Defendant Branch Banking and Trust Company's Motion to Dismiss Plaintiffs' Complaint, or, in the Alternative, Motion for Summary Judgment, Doc. No. 16, Defendant's Motion to Strike Jury Demand, Doc. No. 17, and Plaintiffs' Motion to Stay Proceedings, Doc. No. 19. The Court has reviewed the record and concludes that no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2011). For the reasons that follow, the Court will DENY Plaintiffs' Motion to Stay Proceedings, GRANT-IN-PART and DENY-IN-PART Defendant's Motion to Dismiss Plaintiffs' Complaint, or, in the Alternative, Motion for Summary Judgment, and DENY without prejudice Defendant's Motion to Strike Jury Demand.

**I.   BACKGROUND**

Plaintiffs V. Charles Donnelly and Deborah A. Steffen, who are proceeding *pro se*, commenced this action against Branch Banking and Trust Company ("BB&T") on or about

1

February 4, 2013 in the Circuit Court for Calvert County, Maryland. The action was removed to this Court on March 20, 2013.[1]

Plaintiffs own an investment interest in property located at 14554 Solomons Island Road, Solomons, Maryland (hereinafter, "the Property"). The Property is an unimproved lot consisting of 15,000 square feet located in the Solomons town center, is approved for development, and is zoned as commercial/residential. Plaintiffs hold in partnership a 10% fee simple ownership interest in the Property. Solomons Two, LLC (hereinafter, "Solomons Two" or "the LLC"), a Maryland limited liability company, owns an undivided 90% interest in the Property. Plaintiffs own a 50% membership interest in Solomons Two, while Christine McNelis and Catherine Erickson-File own the remaining 50%. McNelis and Erickson-File are not parties to this lawsuit.

On July 27, 2006, Solomons Two executed a Deed of Trust in favor of BB&T in exchange for a loan of $696,000.00, which was used for the purchase of the Property. The Property was listed as collateral security for the Note in the Deed of Trust. Plaintiffs and the other members of Solomons Two guaranteed the debt to BB&T.[2] The Note was originally scheduled to mature about a year later, but was modified and the maturity date extended on five occasions. The Note finally matured on May 19, 2012, and was not extended further.

In the fall of 2011, Plaintiffs advised Brenda Sucher, BB&T's commercial mortgagor and the individual who handled the bank's business with Plaintiffs for several years, that the terms of the Deed of Trust "were causing financial stress on Solomons Two and its members and those members sought to renegotiate" its terms to "avoid any default." Sucher arranged a meeting with

---

[1] On June 27, 2013, the Court denied Plaintiffs' Motion to Strike Notice of Removal or, in the Alternative, to Remand, and granted Defendant fifteen days to answer or otherwise respond to the Complaint. Doc. No. 15. Defendant timely filed the pending motion on July 9, 2013.

[2] Plaintiffs contend in their opposition brief to Defendant's Motion to Dismiss that they "are not guarantors under the Guaranty Agreements dated July 27, 2006." Doc. No. 19 at 2. However, Plaintiffs' arguments regarding the enforceability of the Guaranty Agreements do not affect the Court's analysis of Plaintiffs' causes of action in this case. *See infra* Part II. As noted by Plaintiffs in their opposition brief, their Complaint "sounds in tort" and is based on Defendant's conduct during refinancing negotiations. Doc. No. 19 at 6.

her boss Carole Taylor, Vice President of BB&T and an individual with authority to restructure loans for clients in financial difficulty. In November 2011, Plaintiffs and the LLC applied for an extension of the maturity date of the Note, and communicated extensively with Taylor during the process. An extension was signed February 17, 2012, which provided a new maturity date of May 19, 2012. At that time, Taylor told Plaintiffs that once the Note matured in May, the parties could assess Plaintiffs' financial options.

In February 2012, BB&T contacted Donnelly to inform him that there were problems with its Deed of Trust for the Solomons Two property. BB&T determined that Donnelly's 10% ownership interest in the Property was not secured by the existing Deed of Trust, and requested that Donnelly execute an additional deed of trust to secure Defendant's interest in the entire Property. Taylor informed Donnelly that execution of the additional deed of trust would be required before the bank would agree to further extensions or modifications of the Solomons Two loan. Relying on Taylor's representations, Donnelly executed the additional deed of trust.

In April 2012, Plaintiffs and the LLC requested through Taylor an additional extension on the Note which was scheduled to mature in May. Around that time, Plaintiffs also entered into an agreement with the non-party members of the LLC that provided the following:

> Donnelly-Steffen agree to immediately pursue a refinancing or pay-off of the BB&T first mortgage on the Solomons Two, LLC, property for the purpose of releasing [McNelis and Erickson-File] from any liability on the BB&T Note and Deed of Trust. [Plaintiffs] will assume the liability for the BB&T mortgage amount. The obligation to obtain this release . . . [is] contingent upon [Plaintiffs] obtaining refinancing by either a private lender or lending institution to satisfy the BB&T debt and the release of [McNelis and Erickson-File] from any liability on said mortgage.

BB&T was not a signatory to the agreement.

In May 2012, Plaintiffs advised Taylor of their agreement with the other members of the LLC and conveyed an offer to Taylor to implement the members' agreement and restructure the

3

loan agreement to prevent a default. Taylor reacted "enthusiastically" to Plaintiffs' offer, describing it as one "that could not be turned down." Taylor "confirmed" most of the financials of Plaintiffs' proposal and "assured" them there would be no issues with releasing McNelis and Erickson-File as guarantors and implementing the terms. In subsequent conversations with Plaintiffs, Taylor "repeatedly represented and reassured" them that restructuring under Plaintiffs' proposed terms, including a one-year extension on the Note's term, would not be a problem. Taylor represented that further bank approval "was just a formality" based on her recommendation and the strength of the proposed financial terms.

Taylor proposed to Plaintiffs that the settlement would be entered in mid-June 2012, following the maturity date of the Note. Taylor repeatedly reassured Plaintiffs that she had the authority to restructure, that BB&T would accept the terms and that settlement would take place before June 30. Plaintiffs allege that "[i]n reliance on Taylor's representations, Plaintiffs ceased looking for alternative financing from other lenders and private individuals and focused on development and other investors for the property."

On June 29, Taylor e-mailed Plaintiffs and stated that BB&T was willing to refinance the loan on financial terms that differed from Plaintiffs' original proposal. For example, BB&T was willing to extend the maturity date on the Note for six months, not one year. Taylor's proposal also provided that McNelis and Erickson-File would not be released. Taylor further informed Plaintiffs that they had until July 2, 2012 to accept BB&T's offer. There was no mention in Taylor's e-mail of Plaintiffs' original, proposed terms or a settlement date.

On July 9, 2012, Donnelly sent Taylor a letter criticizing her for a lack of professionalism and misrepresentations with respect to the restructuring of the loan. Donnelly renewed Plaintiffs' original offer of restructuring terms, and threatened legal action if an amicable

4

resolution could not be reached. On July 12, counsel for BB&T responded to Donnelly's letter. That letter strongly disagreed with Donnelly's allegations and stressed that no binding agreement was ever reached between Plaintiffs and BB&T. However, BB&T offered Donnelly the chance to withdraw his letter and re-enter negotiations on certain conditions, including an agreement by Plaintiffs to sign a release of their rights and a waiver of defenses they may have against BB&T arising out of the discussions with Taylor, the loan documents held by BB&T, and actions taken by BB&T and its employees. Donnelly and Steffen signed letters agreeing to the terms of BB&T's letter on July 26 and July 30, 2012, respectively.[3]

Plaintiffs subsequently discovered that BB&T had entered into separate negotiations with McNelis and Erickson-File, the other members of Solomons Two and the other guarantors of the loan. These negotiations, held "to the exclusion of Plaintiffs," discussed a new refinancing arrangement which required Plaintiffs' agreement and a release of their interest in the Property and the LLC. Plaintiffs also allege that on August 12, 2012, Donnelly received a letter from McNelis and Erickson-File's attorney stating that BB&T informed him that the bank made an offer of forbearance on the Note to Plaintiffs, and that Plaintiffs had failed to communicate that offer to the other Solomons Two members. The letter implied that Donnelly had rejected BB&T's alleged offer and breached his fiduciary duty to McNelis and Erickson-File by failing to inform them of the offer. Donnelly responded to the letter the following day, denying that he had received an offer of forbearance and demanding to know who made such a representation. Donnelly never received a response.

Plaintiffs further believe that BB&T acted in "bad faith" and with "malice" by retaliating against Plaintiffs and attempting to cause them economic harm with respect to their investment

---

[3] Plaintiffs allege that BB&T rejected their letters of release because they did not use the form provided by BB&T in the July 12 letter. Compl. ¶ 23. There is no indication from BB&T's Motion, however, that it rejected the release agreements.

interest in Solomons One, LLC (hereinafter, "Solomons One"), which was also financed by BB&T. Plaintiffs hold a one-third member interest in this separate LLC. In August 2012, BB&T notified Plaintiffs and the other members of Solomons One that when its deed of trust note matured in December 2012, it would not be extended. BB&T also notified Donnelly that his business line of credit loan, which he had for over ten years, would not be renewed in December 2012. While they attempted to refinance the loan on Solomons One, Plaintiffs learned that BB&T had filed a confessed judgment complaint in state court in October, 2012 against the guarantors of the Solomons One loan. Plaintiffs believe that BB&T's motivation was to cause Plaintiffs economic harm. Plaintiffs also believe that their accounts have been "tagged" or "targeted" by BB&T, as the bank informed them that any communications regarding Solomons One would have to be directed to BB&T's counsel.

Plaintiffs state four causes of action against BB&T: (1) negligence; (2) negligent misrepresentation; (3) promissory estoppel; and (4) breach of contract – breach of implied covenant of good faith and fair dealing. They seek compensatory damages in the amount of $1,000,000 on each count.

## II.     PLAINTIFFS' MOTION TO STAY PROCEEDINGS

"The power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936). In determining whether to grant a stay of proceedings, the Court considers "the length of the requested stay, the hardship that the movant would face if the motion were denied, the burden a stay would impose on the nonmovant, and whether the stay would promote judicial economy by avoiding

duplicative litigation." *In re Mut. Funds Inv. Litig.*, No. MDL 1586, 2011 WL 3819608, at *1 (D. Md. Aug. 25, 2011).

Plaintiffs appear to request a stay of these proceedings pending the outcome of certain state court proceedings. Doc. No. 19 at 6-7. Specifically, Plaintiffs have moved to vacate confessed judgments entered against them and in favor of BB&T in the Circuit Court for Calvert County, Maryland. Plaintiffs contend that if the confessed judgments are vacated, they will seek a declaratory judgment as to whether any guaranty agreement exists between the parties and will file defenses and counterclaims, including limitations, novation, discharge, and breach of contract. Plaintiffs have failed to articulate any justification for staying the federal court proceedings, however. Plaintiffs have not demonstrated that duplicative litigation will result by proceeding with the federal court action. Plaintiffs' causes of action in this case sound in tort, and are not dependent on the enforceability of the guaranty agreement. Furthermore, Plaintiffs filed this action, and to stay proceedings would impose an undue and unnecessary burden on Defendant. Accordingly, Plaintiffs' Motion to Stay Proceedings will be denied.

### III. DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' COMPLAINT, OR, IN THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT

#### A. Standard of Review

The purpose of a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure is "to test the sufficiency of [the] complaint." *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). Except in certain specified cases, the complaint need only satisfy Rule 8(a) of the Federal Rules of Civil Procedure, which requires a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 570 (2007).  In resolving a motion to dismiss, the Court should proceed in two steps.  First, the Court should determine which allegations in the Complaint are factual allegations entitled to deference, and which are mere legal conclusions that receive no deference. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.* at 678.  Second, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."  *Id.* at 679.

In its determination, the Court must "accept the well-pleaded allegations of the complaint as true," *Albright v. Oliver*, 510 U.S. 266, 268 (1994), and "must construe factual allegations in the light most favorable to the plaintiff," *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 783 (4th Cir. 1999).  The Court should not, however, accept unsupported legal allegations, *Revene v. Charles Cnty. Comm'rs*, 882 F.2d 870, 873 (4th Cir. 1989), "legal conclusion[s] couched as . . . factual allegation[s]," *Papasan v. Allain*, 478 U.S. 265, 286 (1986), or conclusory factual allegations devoid of any reference to actual events, *United Black Firefighters of Norfolk v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979).  "Factual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  *Twombly*, 550 U.S. at 555.

When a court considers matters outside the pleadings, a Rule 12(b)(6) motion to dismiss "must be treated as one for summary judgment under Rule 56."  Fed. R. Civ. P. 12(d).  Summary judgment is only appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986).  The Court must "draw all justifiable inferences in favor of the

nonmoving party, including questions of credibility and of the weight to be accorded to particular evidence." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520 (1991) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). In ruling on a motion for summary judgment, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ." *Okoli v. City of Balt.*, 648 F.3d 216, 231 (4th Cir. 2011) (quoting *Anderson*, 477 U.S. at 255).

To defeat a motion for summary judgment, the nonmoving party must come forward with affidavits or other similar evidence to show that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A disputed fact presents a genuine issue "if, after reviewing the record as a whole . . . a reasonable jury could return a verdict for [the non-moving party]." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 959 (4th Cir. 1996) (citing *Anderson*, 477 U.S. at 248). Although the Court should believe the evidence of the nonmoving party and draw all justifiable inferences in his favor, a nonmoving party cannot create a genuine dispute of material fact "through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985). Furthermore, "a nonmovant cannot defeat summary judgment with merely a scintilla of evidence." *American Arms Int'l v. Herbert*, 563 F.3d 78, 82 (4th Cir. 2009).

B. <u>The Maryland Credit Agreement Act</u>

BB&T argues that Plaintiff's causes of action are barred by the Maryland Credit Agreement Act. The Act defines "credit agreement" as "a covenant, promise, undertaking, commitment, or other agreement by a financial institution to . . . forbear from collecting or exercising any right to collect a debt; or . . . [o]therwise extend credit." Md. Code, Cts. & Jud. Proc. § 5-408(a)(2)(i). "'Credit agreement' includes agreeing to take or to not take certain

actions by a financial institution in connection with an existing or prospective credit agreement." *Id.* § 5-408(a)(2)(ii). The statute further provides that "[a] credit agreement is not enforceable by way of action or defense unless it: (1) Is in writing; (2) Expresses consideration; (3) Sets forth the relevant terms and conditions of the agreement; and (4) Is signed by the person against whom its enforcement is sought." *Id.* § 5-408(b).

The purpose of the Act was to "protect lenders against claims that the lender made a verbal promise to loan money and then refused to do so, or that the lender verbally agreed to extend the terms of the loan." *Dupont Heights Ltd. P'ship v. Riggs Nat. Bank of Wash., D.C.* 949 F. Supp. 383, 389 (D. Md. 1996) (quoting 1989 General Assembly of Maryland, Floor Report, house Bill 704, Senate Judicial Proceedings Committee). "[A] court should only engage the statute of frauds portion of the Act when, either through affirmative claim or defense, a commercial borrower or lender either attempts to recover on a verbal promise to lend/borrow, or seeks to enforce a verbal modification of an existing credit agreement." *Pease v. Wachovia SBA Lending, Inc.*, 6 A.3d 867, 875 (Md. 2010).

In *Pease*, the appellants were seeking to open, modify, or vacate confessed judgments that were entered against them, and were asserting claims of negligence, fraud, and breach of fiduciary duty against the lender. *Id.* at 871. It was not clear on appeal whether, following the opening of the confessed judgment, the appellants would be asserting counterclaims that would entitle them to damages, notwithstanding the enforceability of the relevant credit agreement, or whether they would argue that the agreement was not enforceable in the first instance. *Id.* at 874. The court therefore addressed both possibilities.

First, the court held that the Maryland Credit Agreement Act would not bar Plaintiff's counterclaims because they did not constitute "an attempt to enforce either (1) an oral credit

agreement; or (2) a verbal modification of their existing loan agreement." *Id.* at 875. The court reasoned as follows:

> The filing of offensive counterclaims using the tort theories of negligence, fraud, and breach of fiduciary duty would be on the basis that, as the [appellants] acknowledge, any recovery on such claims would serve as a set-off against any judgment on the guarantees in favor of [the lender]. Accordingly, where such counterclaims are allowed to be filed, the [appellants] would not seek thereby to enforce or modify an oral agreement, but would be asserting such claims notwithstanding the implicitly conceded enforceability of the credit agreement . . . . On the other hand, the legislative history of the Act is clear that, if the [appellants] were asserting the counterclaims as a means to defeat directly or attain a modification of the credit agreement with [the lender], the Maryland Credit Agreement Act would be triggered and bar consideration of the underlying allegations and evidentiary proffers in determining whether the confessed judgments should be opened, modified, or vacated.

*Id.* at 876 (footnotes omitted). The court further held that to the extent the appellants sought to declare the credit agreement void *ab initio*, they would essentially be seeking an order from the court that they did not have to pay back the loan or that the lender could not execute on the appellants' assets. *Id.* at 878. As such, they would effectively be arguing for the enforcement of an oral modification of the original terms of the loan and guarantees, a claim that is plainly barred by the Maryland Credit Agreement Act. *Id.* With that background in mind, the Court will address Plaintiffs' causes of action in this case.

      C.      <u>Negligence (Count I) and Negligent Misrepresentation (Count II)</u>

Plaintiffs' claims for negligence and negligent misrepresentation are based on the same alleged course of conduct on the part of BB&T, and the Court will therefore analyze them together. Both causes of action appear to rely on allegations that Plaintiffs had a long-term, contractual relationship with BB&T; BB&T had a duty to provide accurate representations to Plaintiffs during refinancing negotiations; BB&T failed to make accurate representations during negotiations; BB&T's misrepresentations included its Vice President's statements regarding her

11

authority to negotiate on behalf of BB&T and her representations that Plaintiffs' proposed refinancing terms would be accepted; Plaintiffs relied on BB&T's misrepresentations; and the misrepresentations harmed Plaintiffs because they relied upon them in making decisions regarding alternative financing and development of the Property. Compl. ¶¶ 32-50.

As a preliminary matter, the Court holds that Plaintiffs' claims of negligence and negligent misrepresentation do not constitute an attempt to enforce an oral credit agreement or an oral modification of the parties' existing loan agreement. Plaintiffs seek damages for Defendant's allegedly tortious conduct during the refinancing negotiations, and their entitlement to damages does not appear to depend upon the enforcement of an oral modification to the loan agreement. Accordingly, Counts I and II are not barred by the Maryland Credit Agreement Act.[4]

That is merely the beginning of the analysis, however. To sustain either a negligence or negligent misrepresentation claim, Plaintiffs must establish that the Defendant owed them a duty of care. *See, e.g.*, *Jacques v. First Nat'l Bank of Md.*, 515 A.2d 756, 758 (Md. 1986) (outlining elements of negligence claim); *Spaulding v. Wells Fargo Bank, N.A.*, 714 F.3d 769, 781 (4th Cir. 2013) (citing *Goldstein v. Miles*, 859 A.2d 313, 332 (Md. Ct. Spec. App. 2004) (internal

---

[4] In this particular context, Defendant's reliance on *Kuechler v. Peoples Bank*, 602 F. Supp. 2d 625 (D. Md. 2009), is misplaced. The court in *Kuechler* did not dismiss the plaintiffs' negligence and negligent misrepresentation claims because they were barred by the Maryland Credit Agreement Act. Rather, the court dismissed these claims because it determined that the defendant did not owe any duty of care to the borrowers. *Id.* at 633-35. The *Kuechler* court's analysis of the Maryland Credit Agreement Act occurred in the context of analyzing the plaintiffs' claims that the defendant engaged in illegal banking practices. *Id.* at 632.

Defendant also argues that *Pease* should be distinguished because the appellants sought to open, modify, or vacate a confessed judgment, circumstances that are not present here. However, the procedural posture in *Pease* did not dictate or limit the Court of Appeals' holding. In fact, the court cited favorably to *Four A's Inv. Co., LLC v. Bank of Am. Corp.*, No. 09-00351-CV-W-FJG, 2010 WL 2720713 (W.D. Mo. July 6, 2010), in which the Missouri federal district court addressed whether the Commercial Credit Agreement Statute of Frauds, Missouri's analog to § 5-408(b), barred plaintiffs' common law tort claims of negligence, negligent misrepresentation, fraudulent misrepresentation, and breach of covenant. *See Pease*, 6 A.3d at 877 n.13. In *Four A's*, the plaintiffs' causes of action were based on allegations that the defendant lender "made oral representations that the loan would be approved within a certain time" and "misrepresented the status of the loan when asked why the process was taking so long." 2010 WL 2720713, at *4. The court held that plaintiffs' tort claims were not barred because they were "not seeking to enforce an oral promise to loan money." *Id.* Rather, the allegations were based entirely on the way in which the loan process was conducted. Accordingly, *Pease* does not support a conclusion that Plaintiffs' negligence and negligent misrepresentations claims are barred by the Maryland Credit Agreement Act.

alterations omitted) (outlining elements of negligent misrepresentation claim); *see also Parker v. Columbia Bank*, 604 A.2d 521, 531 (Md. Ct. Spec. App. 1992) ("In order to state a cause of action [for] negligent misrepresentation [and] negligence[, the plaintiffs] must demonstrate a duty owed to them by [the defendant]."). BB&T argues that even if the claims are not barred by the Maryland Credit Agreement Act, the Court should dismiss or grant summary judgment on Counts I and II because Defendant did not owe Plaintiffs a duty of care.

Maryland law recognizes that the duties arising from a contract may be enforced by negligence actions as well as contract actions. *Jacques*, 515 A.2d at 759. "[W]here a contractual relationship exists between persons and at the same time a duty is imposed by or arises out of the circumstances surrounding or attending the transaction, the breach of such duty is a tort and the injured party may have his remedy by an action on the case, or he may waive the tort and sue for the breach of the contract." *Id.* (quoting *Slacum v. E. Shore Trust Co.*, 163 A.119, 120 (Md. 1932)). In determining whether a tort duty should be recognized in this context, the two major considerations are "the nature of the harm likely to result from a failure to exercise due care, and the relationship that exists between the parties." *Jacques*, 515 A.2d at 759. "Where the failure to exercise due care creates a risk of economic loss only, courts have generally required an intimate nexus between the parties as a condition to the imposition of tort liability." *Id.* "Although contractual privity or its equivalent may satisfy this intimate nexus, not every contractual duty gives rise to a tort duty." *Chubb & Son v. C & C Complete Servs., LLC*, 919 F. Supp. 2d 666, 675 (D. Md. 2013).

Maryland courts have emphasized that "the relationship of a bank to its customer in a loan transaction is ordinarily a contractual relationship between debtor and creditor . . . and is not fiduciary in nature." *Yousef v. Trustbank Sav., F.S.B.*, 568 A.2d 1134, 1138 (Md. Ct. Spec. App.

1990) (citations omitted). "Courts have been exceedingly reluctant to find special circumstances sufficient to transform an ordinary contractual relationship between a bank and its customer into a fiduciary relationship or to impose any duties on the bank not found in the loan agreement." *Parker*, 604 A.2d at 532. Where no special circumstances are present and no contractual basis for a duty of care is alleged, "a lender owes no duty of care to its borrower." *Id.* at 534.

Maryland courts have identified certain circumstances which might impose a tort duty on a bank in a lending relationship. In *Parker*, for example, the Court of Special Appeals noted that "special circumstances" may exist where the bank knows that the customer is placing his trust and confidence in the bank and relying on the bank for counsel and information and the bank consciously assumes a fiduciary duty of care to the customer. *Id.* at 532-33 (citing *Klein v. First Edina Nat'l Bank*, 196 N.W.2d 619, 623 (Minn. 1972), and *Denison State Bank v. Maderia*, 640 P.2d 1235, 1243 (Kan. 1982)). The *Parker* court also noted that special circumstances may exist where the lender (1) takes on extra services on behalf of the borrowers other than furnishing the loan itself; (2) receives additional economic benefits from the transaction other than the underlying mortgage; (3) exercises control over the project to which the loan is directed; or (4) was asked by the borrowers whether any lien actions were pending. *Parker*, 604 A.2d at 533 (citing *Tokarz v. Frontier Fed. Sav. & Loan Ass'n*, 656 P.2d 1089, 1092-94 (Wash. Ct. App. 1982)).

In *Jacques*, the Court of Appeals analyzed a complex lending transaction and found that under the particular circumstances, the bank owed its customers a duty of care in the transaction. In *Green v. Wells Fargo Bank, N.A.*, --- F. Supp. 2d ----, 2013 WL 766196, at *6 (D. Md. Feb. 27, 2013), Judge Chasanow aptly summarized the relevant facts in *Jacques*:

> The plaintiffs . . . entered into a residential sales contract to purchase a home that was contingent upon them obtaining outside financing and required that they

forfeit a $10,000 deposit if such financing was not obtained. They found a bank that agreed to process their loan application, but the bank ultimately determined that they qualified for an amount considerably less than needed to complete the sale. The plaintiffs protested this determination to no avail. Thereafter, they applied for a loan from another lender, but during the time their initial application was being processed interest rates skyrocketed, making the loan for which they were subsequently approved by the second bank significantly more expensive. Thus, the plaintiffs in *Jacques* faced the Hobson's choice of either accepting the first bank's financing offer—which, they contended, was low due to negligence in processing their application—or forfeiting their $10,000 deposit.

The Court of Appeals in *Jacques* emphasized that the bank made two promises to the plaintiffs—first, to process their loan application, and second, to lock in the interest rate—and that these promises were supported by consideration—the plaintiffs' payment of an application fee and a resulting business advantage to the bank. 515 A.2d at 761. The court also noted that the bank "had knowledge that the [plaintiffs] would be legally obligated to either proceed to settlement with the loan determined by the Bank or forfeit their deposit of $10,000.00 and lose any benefit of their bargain." *Id.* at 763. The Court of Appeals recognized that in these circumstances, the bank had a tort duty of reasonable care to borrowers given the "extraordinary financing provisions" in their contract which left plaintiffs "particularly vulnerable and dependent upon the [bank's] exercise of due care." *Id.* at 762. The *Jacques* court further noted that the facts were distinguishable "from those in which a prospective customer simply submits an application for a loan . . . and thereafter claims that the unilateral act of submitting an application gives rise to a duty on the part of a recipient to act upon it without delay." *Id.* In those circumstances, the bank "has not undertaken to process the application, and therefore has no duty to do promptly that which it has no duty to do at all." *Id.*

Following a careful review of the record and relevant caselaw, the Court concludes that Plaintiffs' Complaint contains sufficient allegations and inferences to survive BB&T's Motion with respect to Counts I and II. For example, Plaintiffs allege that in February 2012, Donnelly

executed a deed of trust on his 10% interest in the Property in favor of BB&T in reliance upon the bank's representations that the transaction was a condition to any agreement by BB&T to modify the Solomons Two loan agreement.[5] Compl. ¶ 11. Although Plaintiffs may not be able to rely on the original, Solomons Two loan agreement as imposing a duty upon BB&T in subsequent refinancing negotiations,[6] it is conceivable that the transaction involving Plaintiffs' 10% interest in the Property could have imposed a duty of care on BB&T in subsequent negotiations with Plaintiffs. Indeed, one of the deciding factors in *Jacques* was that the bank had received consideration and a business advantage in exchange for a promise connected to a loan application. 515 A.2d at 761; *see also Parker*, 604 A.2d at 533 (noting that special circumstances may exist where the bank receives economic benefits beyond those of the underlying mortgage). The transaction involving Plaintiffs' 10% interest could also be relevant to Plaintiffs' vulnerability or other circumstances that would warrant imposition of a duty of care on BB&T. Defendant has not presented any evidence outside the pleadings that affect this analysis.

The Court is rightfully reluctant to transform the lender-borrower relationship in this case into a fiduciary relationship or to otherwise impose duties on BB&T beyond those found in the parties' loan agreements. *See id.* at 532. However, based on the inferences and allegations outlined above and the undeveloped factual record, it would be premature for the Court to

---

[5] Plaintiffs allege that although Donnelly was named as the owner in the deed, he held the 10% interest in partnership with Steffen. Compl. ¶ 4.

[6] There is some disagreement within this District as to whether an existing loan agreement can impose a duty of care on a lender in subsequent loan modification negotiations. *Compare Green*, 2013 WL 766196, at *7 (holding that underlying mortgage did not govern whether the bank owed the plaintiffs a duty of care in processing loan modification application) *with Neal v. Residential Credit Solutions, Inc.*, No. JKB-11-3707, 2013 WL 428675, at *6 (D. Md. Feb. 1, 2013) (denying summary judgment on negligent misrepresentation claim where original mortgage agreement between the plaintiffs and bank could have imposed a duty on the bank to provide truthful information to plaintiffs in subsequent discussions regarding a loan modification).

conclude that BB&T did not owe Plaintiffs a duty of care. Accordingly, BB&T's Motion will be denied as to Plaintiffs' negligence and negligent misrepresentation claims.

> D. Promissory Estoppel (Count III)

In Maryland, "promissory estoppel is an alternative means of obtaining contractual relief" where acceptance and consideration may be lacking. *Maryland Transp. Auth. Police Lodge No. 34 v. Maryland Transp. Auth.*, 5 A.3d 1174, 1227 (Md. Ct. Spec. App. 2010), *rev'd on other grounds*, 21 A.3d 1098 (Md. 2011). To state a claim for promissory estoppel, a plaintiff must establish the following: (1) a clear and definite promise; (2) where the promisor has a reasonable expectation that the offer will induce action or forbearance on the part of the promise; (3) which does induce actual and reasonable action or forbearance by the promise; and (4) causes a detriment which can only be avoided by enforcement of the promise. *Pavel Enters., Inc. v. A.S. Johnson Co., Inc.*, 674 A.2d 521, 532 (Md. 1996) (adopting test from the Restatement (Second) of Contracts § 90(1) (1979)). "Thus, . . . the nature of a lawsuit in which promissory estoppel is invoked remains that of an action to enforce a contract." *Suburban Hosp., Inc. v. Sampson*, 807 F. Supp. 31, 33 (D. Md. 1992).

In support of their promissory estoppel claim, Plaintiffs allege that they offered refinancing terms to Defendant's agent, Defendant's agent accepted the terms, but Defendant did not complete settlement on the terms. Compl. ¶ 52. At its core, Plaintiffs' promissory estoppel claim requires enforcement of an oral modification to the underlying loan agreement with BB&T. Such a claim is plainly barred by the Maryland Credit Agreement Act. Granting Plaintiffs leave to amend with respect to their promissory estoppel claim would be futile, and therefore, the Court will dismiss Count III with prejudice.

17

E. Breach of Contract – Breach of Implied Covenant of Good Faith and Fair Dealing (Count IV)

"Maryland law does not recognize an independent cause of action for breach of the implied covenant of good faith and fair dealing." *Cutler v. Wal-Mart Stores, Inc.*, 927 A.2d 1, 11 (Md. Ct. Spec. App. 2007). A breach of the implied covenant simply supports a cause of action for breach of contract. *Id.* "The implied duty of good faith prohibits one party to a contract from acting in such a manner as to prevent the other party from performing his obligations under the contract." *Id.* (quoting *Mount Vernon Props., LLC v. Branch Banking and Trust Co.*, 907 A.2d 373, 381 (Md. Ct. Spec. App. 2006)). "[T]he duty of good faith merely obligates a lender to exercise good faith in performing its contractual obligations; it does not obligate a lender to take affirmative actions that the lender is clearly not required to take under its loan documents." *Parker*, 604 A.2d at 531.

Count IV of Plaintiffs' Complaint is based on the following alleged conduct by BB&T: (1) rejecting Plaintiffs' offer to prevent a default and failing to perform settlement as the parties agreed, Compl. ¶¶ 55-56; (2) entering into undisclosed refinancing negotiations with the other members of Solomons Two and offering terms less favorable that those agreed to by Taylor, *id.* ¶ 57; (3) representing to the other members of Solomons Two that BB&T had offered Plaintiffs forbearance on the loan and that Plaintiffs had rejected the offer, *id.* ¶ 58; and (4) taking retaliatory action against Plaintiffs' other investments and loans held by BB&T by calling such loans and interfering with the refinancing of those loans, *id.* ¶ 59.

Plaintiffs' claim fails for the simple reason that Plaintiffs do not and cannot plausibly allege that BB&T prevented them from performing their obligations pursuant to the underlying loan agreement. The loan agreement did not oblige Defendant to extend the maturity date of the

Note and prevent Plaintiffs' default, and the loan agreement did not forbid BB&T from having discussions with the other members of Solomons Two or require it to disclose such discussions to Plaintiffs. Similarly, the loan agreement in no way prevented BB&T from enforcing separate loan agreements it had with Plaintiffs. *See, e.g.*, *Parker*, 604 A.2d at 531 ("[The plaintiffs] have merely alleged that [the defendant] failed to take certain actions that [the defendant] was clearly *not* required to take under the loan agreement."). To the extent Plaintiffs seek to enforce an oral modification of the loan agreement, such claims are plainly barred by the Maryland Credit Agreement Act. Because Plaintiffs cannot plead that Defendant prevented them from performing their contractual obligations, amendment would be futile. Accordingly, Count IV will be dismissed with prejudice.

## IV. DEFENDANT'S MOTION TO STRIKE JURY DEMAND

Defendant maintains that Plaintiffs' Jury Demand should be stricken, and cites provisions in the Promissory Note and Guaranty Agreements dated July 27, 2006, in which Plaintiffs agreed to "waive the right to trial by jury of any matters or claims arising out of this note or any loan document executed in connection herewith." Doc. No. 17-1 at 3; Doc. No. 17-2 at 3, 6. Plaintiffs contend, however, that enforcement of these provisions is barred by limitations or that their obligations have been terminated by subsequent novation of the loan agreement. Doc. No. 20. The Court believes that it would be premature to strike Plaintiffs' jury demand at this stage of the proceedings. It is not clear whether Plaintiffs' negligence and negligent misrepresentation claims arise out of the original loan agreement with BB&T or from other circumstances, such as the 2012 transaction relating to the remaining 10% interest in the property. Furthermore, according to Plaintiffs, their arguments regarding limitations and novation may have already been addressed by the Circuit Court for Calvert County as part of Plaintiffs' efforts to vacate the

confessed judgments entered against them.  Discovery and further development of the confessed judgment actions may provide relevant guidance to the Court in deciding whether to strike Plaintiffs' jury demand.  Accordingly, Defendant's Motion to Strike will be denied without prejudice to refiling.

## V. CONCLUSION

For the foregoing reasons, Plaintiff's Motion to Stay Proceedings will be DENIED, Defendant's Motion to Dismiss Plaintiffs' Complaint, or, in the Alternative, Motion for Summary Judgment, will be GRANTED-IN-PART and DENIED-IN-PART, and Defendant's Motion to Strike Jury Demand will be DENIED without prejudice.  A separate Order will follow.

| | |
|---|---|
| \_\_\_September 19, 2013\_\_ | _____/s/_____ |
| Date | Alexander Williams, Jr.<br>United States District Judge |