**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

|  |  |
|---|---|
| **V. CHARLES DONNELLY,** *et al.*, | * |
| **Plaintiffs,** | * |
| | * |
| **v.** | *      **Case No.: PWG-13-852** |
| | * |
| **BRANCH BANKING AND TRUST CO.,** | * |
| **Defendant.** | * |
| | * |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM OPINION[1]**

This action arises out of a mortgage loan from Defendant bank on a failed real estate investment, secured by a deed of trust on the investment property and guaranteed by Plaintiffs and their co-investors. Following several extensions of the promissory note, Plaintiffs sought to restructure the note and release some of the investors from the guaranty. According to Plaintiffs, Defendant's agent initially indicated that the loan would be modified as requested and, when Defendant refused to so modify the note, Plaintiffs filed suit alleging, *inter alia*, negligence and negligent misrepresentation. Defendant now seeks summary judgment on the grounds that it did not owe a tort duty to Plaintiffs and, in any event, documentary evidence does not show that Defendant's agent ever made any clear statements with respect to the loan modifications.

---

[1] This Memorandum Opinion disposes of (1) Defendant Branch Banking & Trust Co.'s Motion for Summary Judgment ("Def.'s Summ. J. Mot."), ECF No. 51, and supporting Memorandum ("Def.'s Summ. J. Mem."), ECF No. 51-1; Plaintiffs V. Charles Donnelly and Deborah Steffen's Opposition ("Pl.'s Summ. J. Opp'n"), ECF No. 56; and Defendant's Reply ("Def.'s Summ. J. Reply"), ECF No. 60; and (2) Defendant's Renewed Motion to Strike Jury Demand ("Def.'s Mot. to Strike"), ECF No. 55, and supporting Memorandum ("Def.'s Strike Mem."), ECF No. 55-1; Plaintiffs' Opposition ("Pls.' Strike Opp'n"), ECF No. 59; and Defendant's Reply ("Def.'s Strike Reply"), ECF No. 61.

Plaintiffs argue that a duty arose when one of the Plaintiffs executed a deed of trust on his personal share of the investment property in favor of Defendant in connection with an earlier loan modification and that there were clear representations made to Plaintiffs that the loan would be modified.  I find that the earlier deed of trust did not create a special relationship giving rise to a duty with respect to any later modifications, but that there is a genuine dispute as to whether Defendant's agent breached a duty to make accurate representations with respect to Plaintiffs' claims for negligent misrepresentation.  Accordingly, Defendant's motion is granted in part and denied in part.

## I.     BACKGROUND

When considering a motion for summary judgment, the court must view "the evidence and all reasonable inferences therefrom in favor of the nonmovant."  *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 460 (4th Cir. 2012).  Plaintiffs V. Charles Donnelly and Deborah A. Steffen are two of the four investors in an unsuccessful real estate venture involving a property located at 14554 Solomons Island Road, in Solomons, Maryland (the "Property").  Donnelly owns an undivided 10% interest in the Property and the remaining 90% is owned by an entity called Solomons Two, LLC ("Solomons Two"), in which Donnelly and Steffen are members holding a twenty-five percent interest each, and the remainder is owned by non-party members Christine McNelis and Catherine Erickson-File (collectively, the "Members").  *See* Deed, Pls.' Summ. J. Opp'n Ex. 2, ECF No. 56-3; Donnelly Aff. ¶ 3, Pls.' Summ. J. Opp'n Ex. 12, ECF No. 56-3.

The Property was purchased by Solomons Two and Donnelly for $950,000 on July 27, 2006.  That same day, Solomons Two took out a loan from Defendant Branch Bank and Trust Co. ("BB&T") in the amount of $696,000 (the "Loan"), evidenced by a promissory note (the

"Note") which matured on July 27, 2007.  Promissory Note, Def.'s Summ. J. Mem. Ex. 1, ECF

No. 51-2.[2]  The loan was secured by a deed of trust in favor of BB&T on Solomons Two's

interest in the Property, Deed of Trust, Def.'s Summ. J. Mem. Ex. 3, ECF No. 51-4, and

guaranteed by Donnelly and Steffen personally, *see* Guaranty Agreement, Def.'s Summ. J. Mem.

Ex. 2, ECF No. 51-3.  The Guaranty Agreement contains an express jury waiver (the "Jury

Waiver"), which says:

> <u>WAIVER OF TRIAL BY JURY,</u> UNLESS EXPRESSLY PROHIBITED BY
> APPLICABLE LAW, THE UNDERSIGNED HEREBY WAIVE THE RIGHT
> TO TRIAL BY JURY OF ANY MATTERS OR CLAIMS ARISING OUT OF
> THIS GUARANTY OR THE BORROWER'S NOTE(S), AND THE RELATED
> LOAN DOCUMENTS EXECUTED IN CONNECTION HEREWITH OR OUT
> OF THE CONDUCT OF THE RELATIONSHIP BETWEEN THE
> UNDERSIGNED AND THE BANK OR THE BORROWER AND THE BANK.

Guaranty Agreement 2.

Between 2007 and the end of 2011, the note was extended four times and was set to

mature on December 19, 2011.  Donnelly Aff. ¶ 4; 2010 Loan Agreement, Def.'s Summ. J.

Mem. Ex. 17, ECF No. 51-18.  During most of this time, the Loan was administered for BB&T

by Brenda Sucher.  *Id.* ¶ 5.

The events leading up to the last modification of the Loan began in 2011, when "the

Solomons Two members were experiencing difficult[ies] with payments of the LLC Note, due to

the economy and the high rate of principal BB&T required as payment on the loan."  *Id.* ¶ 5.

Donnelly sent a letter to Sucher stating,

> Solomons Two monthly commitment to payment of the first mortgage and a line
> of credit is a tremendous drag on the finances of the present investors.  Relief is
> needed from the current note holders [] over the next 12 to 18 months to move the
> project ahead in terms of marketing and new investors.

---

[2] It appears that there was another, smaller loan from PNC Bank that was secured by a mortgage
on the Property, but that loan is not relevant to this case.

Letter from V. Charles Donnelly to Brenda J. Sucher 2 (Nov. 19, 2011), Pls.' Summ. J. Opp'n Ex. 8, ECF No. 56-3.   Donnelly went on to explain that Solomons Two was "working on refinancing as new investors step in and request[ed] that BB&T re-evaluate what it can do to assist getting through these tough times for the next year."   *Id.* at 2.   Donnelly was referred to "Carol Taylor who [Sucher] described as her boss, the head of BB&T's Asset Resolution Group" in Maryland.   *Id.*   Donnelly expressed loyalty to BB&T "because it had always treated us fairly" and Sucher "stated BB&T wanted to keep [Solomons Two] as customers . . . and in a casual manner said 'BB&T has lots of money and we would like to give you some.'"   *Id.*

On December 6, 2011, Donnelly e-mailed the other members of Solomons Two to provide updates on various aspects of their business transactions.   Email from Christine McNelis to V. Charles Donnelly et al. (Dec. 6, 2011, 11:26 EST), Pls.' Summ. J. Opp'n Ex. 9, ECF No. 56-3.   According to Donnelly, BB&T did not react favorably to his request for a further modification, but eventually discussed "the use of a 'three month bump,'" in light of Solomons Two's "transition situation" as it tried to get "new investors coming in to Solomons Two which will address the indebtedness on the property."   *Id.* at 2.   On December 21, 2011—two days after the Loan was due to be repaid—Taylor e-mailed McNelis and Donnelly saying,

> As you are all in continuing negotiations with the investors and we need updated financial information, after the beginning of the year I will go for approval of a 90 day extension to March 2012, with no change in other terms such as rate or payment amount.   This would allow for receipt and analysis of the financial information and to see if you arrive at a definitive deal with the investors.

Email from Carol Taylor to Christine McNelis et al. (Dec. 21, 2011, 10:25 EST), Pls.' Summ. J. Opp'n Ex. 10, ECF No. 56-3.[3]   Donnelly appeared to be working hard to find additional

---

[3] In her deposition, Steffens testified that she believed that the primary purpose for the three-month extension was to allow BB&T to come up with better loan terms, rather than to allow Solomons Two to bring in additional investors and capital.   *See* Steffens Dep. (Pls.' Excerpts)

investors but was struggling to find anybody willing to invest in the Property.  *See* Email from V. Charles Donnelly to Carol Taylor (Jan. 31, 2012, 10:29 EST), Def.'s Summ. J. Mem. Ex. 5, ECF No. 51-6.

It appears that the parties agreed in principle on a short-term extension of the Loan to be executed in February 2012, but shortly before the documents were to be signed, BB&T became concerned that its loan was not fully secured because Donnelly's personal 10% share of the Property remained unencumbered.  BB&T's counsel, Robert Greenberg, informed Donnelly that he would need to execute a second deed of trust on his personal interest in the Property before any modifications would be considered.  *Id.* ¶ 6.  Donnelly questioned the need for a new deed of trust in light of the fact that it never had been necessary before, but he was told that "unless [he] did so, the planned Solomons Two Note extension would not occur and there would be no further discussions of financing."  *Id.*  Donnelly executed the required deed of trust on February 13, 2012, Donnelly Deed of Trust, Def.'s Summ. J. Mem. Ex. 6, ECF No. 51-7, and the Members agreed to a short-term modification of the Loan as of February 17, 2012, February Note Modification, Def.'s Summ. J. Mem. Ex. 4, ECF No. 51-5.  Under the February Note Modification, the Loan would mature on May 19, 2012.  *Id.*

> Growing concerns about the possibility of BB&T not renewing the Solomons One Note [relating to a different investment] and two other members of the LLC, McNelis and Erickson-File desperately seeking a release from the project led [Donnelly] in late March, 2012 to sign a contract with the other two members whereby they would transfer their interests in the LLC and the Property to Deborah Steffen for their release from liability.  Around that time [Donnelly] was also activ[ely] meeting with private investors and talking with several commercial loan officers and several banks to seek financing on the Solomons Two Property. . . . Also, [he] sensed from Taylor that there was less enthusiasm about extending the Note again.

101:16 – 104:15.  However, because Steffen could not point to a single conversation that she heard or participated in, her testimony is not relevant to show the actual purpose of the extension as contemplated by Donnelly or BB&T.

Donnelly Aff. ¶ 7; *see also* Agreement, Pls.' Summ. J. Opp'n Ex. 16, ECF No. 56-3 (dated March 27, 2012).

In early May 2012, Donnelly conveyed to BB&T a proposal for a new loan to issue in Donnelly and Steffen's names, including a $100,000 curtailment on the balance of the Loan and a $50,000 escrow account from which BB&T would withdraw monthly payments in the event they were not paid (the "Modification Proposal").   Donnelly Aff. ¶ 8.   According to Donnelly, Taylor "reacted enthusiastically and in surprise.   She said it was a substantial offer and would not be turned down," although she rejected Donnelly's request for an eighteen-month loan and "insisted on 12 months."   *Id.*   Although additional negotiations ensued and BB&T appeared to have repeated problems receiving documents from Plaintiffs,

> [t]hroughout the loan process and until the eve of scheduled settlement for the end of June, 2012, Taylor expressed her belief that this was the equivalent of a win– win situation for all concerned and that BB&T should jump at the chance to avoid any default.   In conversations she stated to [Donnelly] and independently to Steffen that this loan was a go and any remaining requirements were secondary to the agreed upon terms.

Donnelly Aff. ¶ 8.   Steffen testified that Taylor "said there was no problem with restructuring the loan and having it approved," Steffen Dep. (Def.'s Excerpts) 111:10–11, Def.'s Summ. J. Mem. Ex. 8, ECF No. 51-9, but Plaintiffs never were provided with specific terms, *id.* at 252:18–1. Plaintiffs also did not pay any application fee in connection with the Modification Proposal.   *Id.* at 237:12–19.

Around the same time, Donnelly was exploring other options for refinancing the Loan. On May 1, 2012, he sent a letter to Prince George's Federal Savings Bank.   Letter from V. Charles Donnelly to Hal C. Rich III, President, Prince George's Federal Savings Bank (May 1, 2012), Def.'s Summ. J. Mem. Ex. 20, ECF No. 51-21.   However, there were delays because that

bank required an appraisal of the Property by its approved appraisers.  Email from V. Charles Donnelly to Catherine Erickson-File & Christine McNelis (May 1, 2012, 19:36 EDT), Def.'s Summ. J. Mem. Ex. 19, ECF No. 51-20.  Donnelly also approached Old Line Bank, PNC, and M&T Bank, but none "would even consider a refinance of an empty lot without other investors." *Id.*

On June 13, 2012, Taylor e-mailed Donnelly saying "that the restructure terms are in for approval.  I will be on vacation the week of June 18–22.  Attorney will be working on the documents in the meantime.  I am shooting for settlement prior to month end 6/30/12."  Email from Carol Taylor to V. Charles Donnelly (June 13, 2012, 18:37 EDT), Def.'s Summ. J. Mem. Ex. 9, ECF No. 51-10.  On June 26, 2012, she sent him an e-mail saying, "in the final stages of the process here.  Being optimistic and looking forward to next steps," and asking for the agreement by which McNelis and Erickson-File would be exiting Solomons Two.  Email from Carol Taylor to V. Charles Donnelly (June 26, 2012, 12:36 EDT), Def.'s Summ. J. Mem. Ex. 10, ECF No. 51-11.  Donnelly responded that he was skeptical that the deal would be concluded by the end of the week and that he still needed to see BB&T's terms.  Email from V. Charles Donnelly to Carol Taylor (June 26, 2012, 13:30 EDT), Def.'s Summ. J. Mem. Ex. 10, ECF No. 51-11.

The next day, June 27, 2012, Taylor left a message on Donnelly's voicemail telling him to "please call immediately," Donnelly Aff. ¶ 10, and sent him an email with the subject line "Call me please very important" and no body text, Email from Carol Taylor to V. Charles Donnelly (June 27, 2012, 14:42 EDT), Pl.'s Summ. J. Opp'n Ex. 19, ECF No. 56-3, and made several other calls trying to get hold of Donnelly, *see* Email from Christine McNelis to Deborah Steffen & V. Charles Donnelly (June 17, 2012, 14:45 EDT), Pls.' Summ. J. Opp'n Ex. 20, ECF

No. 56-3.  When Donnelly and Taylor spoke the next day, Taylor "was in a panic and distressed" and informed him that "BB&T would not release McNelis and Erickson-File as requested." Donnelly Aff. ¶ 10.  Donnelly asked her to find out why but Taylor never returned his call.  *Id.*

Shortly after 5:00 p.m. on Friday, June 29, 2012, Taylor sent all of the Members an e-mail summarizing the "terms and conditions under which BB&T is willing to extend the loan to Solomons Two" (the "June 29 Offer") and CCing BB&T's counsel Robert Greenberg.  Email from Carol Taylor to V. Charles Donnelly et al. (June 29, 2012, 17:12 EDT), Pl.'s Summ. J. Mem. Ex. 21, ECF No. 56-3.  The terms of the June 29 Offer differed from those that had been discussed: the extension would be only until December 19, 2012 rather than for twelve months, it did not include any curtailment of the principal balance, it increased the interest rate floor from 5.25% to 5.75%, and it required a $1,500 extension fee.  *Id.*  Further, the monthly payment proposed would have been $5,371.51, only slightly lower than the $5,610.93 required under the Note Modification Agreement and well above the $4,000 that Donnelly had hoped for.  *See* Letter from V. Charles Donnelly to Brenda Sucher (Nov. 11, 2011).  And critically, "BB&T [was] not willing to release guarantors McNelis and Erickson-File."  Email from Carol Taylor to V. Charles Donnelly et al. (June 29, 2012, 17:12 EDT).  After sending the June 29 Offer late Friday afternoon, Taylor gave the Members only until the following Monday, July 2, 2012, to indicate whether they would accept the June 29 Offer.  *Id.*

This sent Donnelly into a fit of pique and led to a series of emails among the Members. According to an email Donnelly sent to the other Members, he "told [Taylor] to go back and make this [modification] happen as she represented it would," and that "[i]f she had said no this doesn't work a month ago, [Donnelly] could have pursued options."  Email from V. Charles Donnelly to Christine McNelis et al. (June 29, 2012, 18:01 EDT), Def.'s Summ. J. Mem. Ex. 12,

ECF No. 51-13.  Erickson-File emailed Donnelly that "it is unrealistic to think that we can meet and agree to their proposal from Friday at 5:30 pm to Monday at close of business.  They have led us all to believe that this was going to happen but [Taylor] was on vacation while it was being done."  Email from Catherine Erickson-File to V. Charles Donnelly et al. (June 29, 2012, 19:20 EDT), Def.'s Summ. J. Mem. Ex. 12, ECF No. 51-13.  McNelis responded by email that "Taylor is at the service of higher level banking executives, so I blame the bank and not her."  Email from Christine McNelis to V. Catherine Erickson-File et al. (June 30, 2012, 1:00 EDT), Def.'s Summ. J. Mem. Ex. 12, ECF No. 51-13.  Donnelly also indicated that he had spoken with an official at another bank about the terms he had proposed to BB&T and had received a positive response.  Email from V. Charles Donnelly to Chris McNelis et al. (June 29, 2012, 18:01 EDT).

In subsequent emails among the Members, Donnelly repeatedly stated that he would not accept the June 29 Offer and needed time to allow his anger to subside before speaking with Taylor.  *See* Email from V. Charles Donnelly to Catherine Erickson-File (June 29, 2012, 19:59 EDT), Def.'s Summ. J. Mem. Ex. 13, ECF No. 51-14; Email from V. Charles Donnelly to Christine McNelis et al. (July 2, 2012, 10:07 EDT), Def.'s Summ. J. Mem. Ex. 14, ECF No. 51-15.  On June 30, 2012, Donnelly sent a letter to M&T Bank seeking once more to refinance the Loan with them.  *See* Letter from V. Charles Donnelly to Michael Morse, Vice President, Chesapeake Business Banking (June 30, 2012), Def.'s Summ. J. Mem. Ex. 21, ECF No. 51-22.

On July 9, 2012, Donnelly sent a letter to Taylor complaining of "a lack of professionalism, misrepresentations and last minute rejection of the modification and extension of the BB&T mortgage for Solomons Two."  Letter from V. Charles Donnelly to Carol Taylor (July 9, 2012) 1, Pl.'s Summ. J. Opp'n Ex. 22, ECF No. 56-3.  Donnelly said that he had "frequently requested status reports and was assured that [the loan modification] was in progress

and that all was well," and that Taylor "repeatedly told [Donnelly] everything was fine, all looked good and there were no issues." *Id.* at 2.  In the letter, Donnelly informed Taylor that if he was not given a modification on the terms he had requested or an extension in which to seek a replacement loan, he would file suit against BB&T.  *Id.* at 2.  Unsurprisingly, this letter prompted a lengthy response from BB&T's counsel informing Donnelly that "neither Ms. Taylor, nor any other officer or employee of the Bank will knowingly communicate with [him]," directing him not to contact BB&T, and setting forth BB&T's litigation position with respect to Donnelly's putative claims.  Letter from Robert Greenberg to V. Charles Donnelly (July 12, 2012) (the "Greenberg Letter"), Pl.'s Summ. J. Opp'n Ex. 23, ECF No. 56-3.  Greenberg took the position that Taylor never made any binding commitment on behalf of BB&T and expressly had told Donnelly to seek other sources of financing, *id.* at 3, and stated that he "[had] advised the Bank, as a result of [Donnelly's] letter, and the threat of imminent litigation, that no restructuring of the Loan should be made at this time; and that the extant Loan documents should be enforced forthwith." *Id.* at 6.

Greenberg also offered Donnelly the opportunity to withdraw his original letter, in which case "the Bank will begin to communicate with [him] and the other Guarantors" provided that they agree to a set of conditions including a waiver of any claims against the bank "from the beginning of the world until the time of the execution and delivery of [Greenberg's] letter." *Id.* at 9–10.  Further, the Greenberg Letter required the Members to agree that BB&T "has made no representations or promises of any kind or nature," and to agree not to

> allege any reliance upon, nor assert the enforceability of, any purported verbal representations or verbal modification or agreement concerning the Loan Documents, whether the same shall be or shall have been alleged to occur or have occurred before, simultaneous with, or after the date of execution and delivery of th[e] letter.

*Id.* at 8.  The Members were instructed to sign and return the final page of the Greenberg Letter if they agreed to its terms.  *Id.* at 10–11.

On July 20, 2012, Donnelly responded by reiterating his demands that BB&T either provide the loan modification he sought or give Solomons Two the opportunity to find a new lender if it wished to avoid litigation.  Letter from V. Charles Donnelly to Robert Greenberg (July 20, 2012), Pls.' Summ. J. Opp'n Ex. 24, ECF No. 56-3.  In that letter, Donnelly stated that "it is unreasonable to ask any party at this point to waive rights, real or imagined."  *Id.* at 2.  Nevertheless, on July 26, 2012, and again on July 30, 2012, Donnelly sent Greenberg letters purporting to accede to the conditions of the Greenberg Letter, Letter from V. Charles Donnelly to Robert Greenberg (July 26, 2012), Pls.' Summ. J. Opp'n Ex. 25, ECF No. 56-3; Letter from V. Charles Donnelly to Robert Greenberg (July 30, 2012), Pls.' Summ. J. Opp'n Ex. 26, ECF No. 56-3.  Greenberg viewed these letters to be "not acceptable" and insisted that, to agree to the conditions in the Greenberg Letter, Donnelly would need to sign and return the Greenberg Letter itself.  Email from Robert Greenberg to V. Charles Donnelly (Aug. 8, 2012, 18:39 EDT).

Notwithstanding Donnelly's apparent refusal to return the Greenberg Letter signed, Greenberg communicated to Donnelly and counsel for the other Members an offer to sell the Loan to the Members provided that certain conditions were met, including Donnelly executing the Greenberg Letter.  Letter from Robert Greenberg to Daniel Guenther (Aug. 9, 2012, 15:43 EDT), Pls.' Summ. J. Opp'n Ex. 28, ECF No. 56-3.  According to counsel for the non-party Members, Daniel Guenther, Donnelly also "received an offer of forbearance" on the Loan but did not inform the other Members of the offer, Letter from Daniel Guenther to V. Charles Donnelly (Aug. 10, 2012), Pls.' Summ. J. Opp'n Ex. 29, ECF No. 56-3, though Donnelly denies

such an offer ever was made, Letter from V. Charles Donnelly to Daniel Guenther (Aug. 13, 2012), Pls.' Summ. J. Opp'n Ex. 30, ECF No. 56-3.

On August 13, 2012, BB&T gave notice that the Note was in default and "elected to accelerate the Note," demanding full payment of the amount due, approximately $596,617. Letter from Robert Greenberg to Solomons Two, LLC et al. (Aug. 13, 2012), Pls.' Summ. J. Opp'n Ex. 31, ECF No. 56-3.   BB&T filed a confessed judgment action (the "Confessed Judgment Action") against Solomons Two and each of the Members in the Circuit Court for Calvert County on October 5, 2012.   Confessed Judgment Docket, *Branch Banking and Trust Co. v. Solomons Two, LLC*, No. 04-C-12-01226 (Md. Cir. Ct. filed Oct. 5, 2012), *available at* http://casesearch.courts.state.md.us/inquiry/inquiryDetail.jis?caseId=04C12001226&loc=63&det ailLoc=CC (last visited Jan. 27, 2015).   A foreclosure action also was commenced against Solomons Two and Donnelly on October 16, 2012.   Foreclosure Docket, *Ruhling v. Solomons Two*, No. 04C12001260 (Md. Cir. Ct. filed Oct. 16, 2012), *available at* http://casesearch.courts.state.md.us/inquiry/inquiryDetail.jis?caseId=04C12001260&detailLoc= CC (last visited Jan. 27, 2015).

On November 30, 2012, the Note was sold for nominal consideration to an entity called LSCG Fund 11, LLC ("LSCG").   Note Purchase and Sale Agreement, Pls.' Summ. J. Opp'n Ex. 32, ECF No. 56-3.   On January 15, 2013, LSCG entered into a contract to sell the Note to an entity called 14554 Solomons Island Road, LLC (Solomons LLC), of which McNelis was a member.   Loan Purchase and Sale Agreement, Pls.' Summ. J. Opp'n Ex. 34, ECF No. 56-3. However, it appears that the sale never closed and, instead, McNelis and Erickson-File were released from their obligations under the Note and dismissed from the Confessed Judgment Action in exchange for $150,000 payment, and were given the option to buy the Note for an

additional $250,000 payment.  Settlement Agreement, Pls.' Summ. J. Mem. Ex. 35, ECF No. 56-3.  On March 11, 2013, the Circuit Court for Calvert County entered a confessed judgment against Donnelly and Steffen in the amount of $470,249.43, plus $70,544.16 in attorneys' fees.  Judgment by Confession, Pls.' Summ. J. Opp'n Ex. 37, ECF No. 56-3.  It appears from the docket that the judgments were vacated and the Confessed Judgment Action reopened in February 2014.  Confessed Judgment Docket.  It also appears that the Foreclosure Action was stayed in December 2013 and remains pending.  Foreclosure Docket.

Donnelly and Steffen filed their initial Complaint and Request for Jury Trial in the Circuit Court for Calvert County on February 4, 2013, Compl., ECF No. 2, setting forth counts for (I) negligence, (II) negligent misrepresentation, (III) promissory estoppel, and (IV) breach of contract arising out of the breach of the implied covenant of good faith and fair dealing.  BB&T removed to this Court, Notice of Removal, ECF No. 1, and moved to dismiss, Def.'s Mot. to Dismiss Pls.' Compl. or, in the Alternative, Mot. for Summ. J., ECF No. 16, and to strike Plaintiffs' jury demand, Def.'s Mot. to Strike Jury Demand, ECF No. 17.  Judge Alexander Williams, to whom this case was assigned until his retirement, granted the motion to dismiss in part, dismissing Plaintiffs' promissory estoppel and breach of contract claims, but allowed their negligence and negligent misrepresentation claims to proceed.  *See Donnelly v. Branch Banking & Trust Co.*, 971 F. Supp. 2d 495 (D. Md. 2013).

With respect to Plaintiffs' claims for negligence and negligent misrepresentation, Judge Williams found that, although a bank ordinarily does not owe a tort duty to its customers, such a duty to negotiate in good faith may have arisen from Donnelly executing the Donnelly Deed of Trust in February 2012 as a condition to any further modifications of the Loan.  *Id.* at 507–08.  Although Judge Williams expressed some skepticism that, ultimately, it would be proper "to

transform the lender–borrower relationship in this case into a fiduciary relationship or to otherwise impose duties on BB & T beyond those found in the parties' loan agreements," he found that Plaintiffs' allegations were sufficient to survive a motion to dismiss. *Id.* at 508. Judge Williams also found it premature to rule on whether Plaintiffs' jury demand should be struck because it was not yet clear whether the negligence and negligent misrepresentation claims arose out of the original agreement containing the Jury Waiver or from other circumstances. *Id.*

The case was transferred to me on November 27, 2013, and discovery closed on June 23, 2014.  Am. Scheduling Order, ECF No. 33.   On June 20, 2014, BB&T filed its Motion for Summary Judgment ("Def.'s Summ. J. Mot."), ECF No. 51, and supporting Memorandum ("Def.'s Summ. J. Mem."), ECF No. 51-1.  Plaintiffs have filed an Opposition ("Pls.' Summ. J. Opp'n"), ECF No. 56, and BB&T has replied ("Def.'s Summ. J. Reply"), ECF No. 60.  On July 7, 2014, BB&T also filed a Renewed Motion to Strike Jury Demand ("Def.'s Mot. to Strike"), ECF No. 55, and supporting Memorandum ("Def.'s Strike Mem."), ECF No. 55-1.  Plaintiffs have filed an Opposition ("Pls.' Strike Opp'n"), ECF No. 59, and BB&T has replied ("Def.'s Strike Reply"), ECF No. 61.  Both motions now are ripe and are before me.  Having reviewed the filings, I find a hearing is not required.  Loc. R. 105.6.

## II.   STANDARD OF REVIEW

Summary judgment is proper when the moving party demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a), (c)(1)(A); *see Baldwin v. City of*

*Greensboro*, 714 F.3d 828, 833 (4th Cir. 2013).   If the party seeking summary judgment

demonstrates that there is no evidence to support the nonmoving party's case, the burden shifts to

the nonmoving party to identify evidence that shows that a genuine dispute exists as to material

facts.   *See Celotex v. Catrett*, 477 U.S. 317, 325 (1986).   The existence of only a "scintilla of

evidence" is not enough to defeat a motion for summary judgment.   *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 251 (1986).   Instead, the evidentiary materials submitted must show facts

from which the finder of fact reasonably could find for the party opposing summary judgment.

*Id.*   "[U]nder Fed. R. Civ. P. 56, as amended in 2010, facts in support of or opposition to a

motion for summary judgment need not *be* in admissible form; the requirement is that the party

identify facts that *could be* put in admissible form."   *Mallik v. Sebelius*, 964 F. Supp. 2d 531, 546

(D. Md. Aug. 28, 2013) (citing *Niagara Transformer Corp. v. Baldwin Techs., Inc.*, No. DKC-

11-3415, 2013 WL 2919705, at *1 n.1 (D. Md. June 12, 2013)).

## III.   DISCUSSION

### A.  Plaintiffs' Standing

At the outset, BB&T argues that Plaintiffs cannot assert any claims arising out of the

relationship between the parties because "[a]ny claim that BB&T was negligent in handling the

Solomons Two loan may only be asserted by Solomons Two," and not by Plaintiffs as

guarantors.   Pls.' Summ. J. Mem. 9.   As BB&T argues, "a guarantor does not have standing to

sue for harm the lender allegedly caused to its borrower."   *Id.* (citing *Wincopia Farms, LP v. G &*

*G, LLC (In re Wincopia Farms, LP)*, Bankr. No. JS-07-15899, Adversary No. JS-07-908, 2009

WL 801733 (Bankr. D. Md. March 25, 2009) (applying Virginia law)).[4]   For this proposition,

---

[4] Although the decision that BB&T has cited to analyzes the standing of guarantors only under
Virginia law, a later decision in the same case addresses a similar issue under Maryland law.   *See*

BB&T relies primarily on an amalgamation of general statements about the standing of guarantors under the laws of various states, *see* Def.'s Summ. J. Mem. 9–10, and has cited one case from this Court applying Maryland law and opining that "the Maryland Court of Appeals would likely require independent harm [to a guarantor] and adopt the majority rule that a guarantor lacks standing to sue for injury to a borrower." *Wincopia Farms, LP v. G & G, LLC*, No. WDQ-11-1159, 2011 WL 6440004, at *4 (D. Md. Dec. 15, 2011).

Plaintiffs respond by insisting—without citing to any supporting law whatsoever, *see* Loc. R. 105.1 (requiring an opposition memorandum to "set[] forth the reasoning and authorities in support of it")—that this suit is not about the relationship between BB&T and Solomons Two at all, but rather is about the negotiations between Plaintiffs and BB&T with respect to a proposed restructuring of the Loan. *See* Pls.' Summ. J. Opp'n 12–15. According to Plaintiffs, the Modification Proposal was negotiated directly between Plaintiffs and BB&T and was not being negotiated on behalf of Solomons Two. *Id.* at 15.

It does not appear that Maryland law allows the threshold question of Plaintiffs' standing to be answered in the abstract.   In *Wincopia Farms, LP v. G & G, LLC (In re Wincopia Farms, LP)*, Bankr. No. JS-07-15899, Adversary No. JS-07-908, 2011 WL 1237651 (Bankr. D. Md. March 31, 2011), the court held that "Maryland appears to be in line with the majority view that a guarantor of a loan is without standing to sue the lender for alleged fraudulent misconduct in making a loan to the borrower, absent an independent harm to the guarantor."  But this simply recognizes the general rule that "[a] plaintiff must allege a wrong against *itself*, not against a third party, to establish standing." *Wincopia Farms*, 2011 WL 6440004, at *3.

---

*Wincopia Farms, LP v. G & G, LLC (In re Wincopia Farms, LP)*, Bankr. No. JS-07-15899, Adversary No. JS-07-908, 2011 WL 1237651 (Bankr. D. Md. March 31, 2011).

Whether a harm was inflicted directly upon Plaintiffs or merely derivatively in their capacity as Solomons Two's guarantors intimately is bound up in the nature of the harm claimed. To resolve the question of whether Plaintiffs have standing without first considering the nature of their claims and the duties, if any, owed by BB&T would be to beg the question.  Accordingly, I will consider Plaintiffs' standing in the context of their claims for relief.

### B.  Negligence

It is "a longstanding principle of Maryland law that the relationship of a bank to its customer in a loan transaction is ordinarily a contractual relationship between a debtor and a creditor and is not fiduciary in nature."  *Parker v. Columbia Bank*, 604 A.2d 521, 532 (Md. Ct. Spec. App. 1992).   "'The mere negligent breach of a contract, absent a duty or obligation imposed by law independent of that arising out of the contract itself, is not enough to sustain an action sounding in tort.'"  *Jacques v. First Nat'l Bank of Md.*, 515 A.2d 756, 759 (Md. 1986) (quoting *Heckrotte v. Riddle*, 168 A.2d 879, 882 (Md. 1961)).  Where, as here, "the failure to exercise due care creates a risk of economic loss only, courts have generally required an intimate nexus between the parties as a condition to the imposition of tort liability.  This intimate nexus is satisfied by contractual privity or its equivalent."  *Id.* at 759–60.

The Maryland Court of Special Appeals has recognized four "special circumstances" that can give rise to a tort duty between a bank and its customer where

> the lender "(1) took on any extra services on behalf of [the borrowers] other than furnishing the money for construction of a home; (2) received any greater economic benefit from the transaction other than the normal mortgage; (3) exercised extensive control over the construction; or (4) was asked by [the borrowers] if there were any lien actions pending."

*Parker*, 604 A.2d at 533 (quoting *Tokarz v. Frontier Fed. Sav. & Loan Ass'n*, 656 P.2d 1089, 1094 (Wash. Ct. App. 1982) (alterations in original)).

In considering BB&T's motion to dismiss (in the absence of any facts other than the allegations in the complaint), Judge Williams found that "it is conceivable that the transaction involving Plaintiffs' 10% interest in the Property could have imposed a duty of care on BB & T in subsequent refinancing negotiations." *Donnelly*, 971 F. Supp. 2d at 508–09.   Indeed, obtaining additional security for the Loan by extracting a deed of trust on Donnelly's personal 10% interest in the Property constituted "greater economic benefit from the transaction" than was represented by the mortgage itself.[5]  And to the extent that executing the Donnelly Deed of Trust created a tort duty on the part of BB&T, that duty ran to Donnelly himself because it was Donnelly who provided the additional consideration.   However, additional facts have been produced as a result of discovery and cited in the summary judgment filings that belie Plaintiffs' claims that the Donnelly Deed of Trust was extracted in the context of negotiations over the refinancing Plaintiffs sought.

Plaintiffs' complaint was unclear about when BB&T had required Donnelly to execute the Donnelly Deed of Trust.   Paragraph 10 of the Complaint contains allegations about the extension signed in February 2012, including that the parties anticipated reassessing where the property stood when the Note matured in May 2012.  Compl. ¶ 10.  The next paragraph alleged that "[i]n late early February, 2012," Donnelly was told that he would need to execute a deed of trust on his personal interest as a precondition to BB&T "extending the current deed of trust and any subsequent extensions or modifications of the note when it matured." *Id.* ¶ 11.  And in the following paragraph, Donnelly began detailing the chain of events leading up to the Modification

---

[5] BB&T argues that the deed of trust on Donnelly's personal 10% interest was "an 'underlying mortgage'" and thus its execution cannot form the basis of a negligence claim under *Parker*. *See* Def.'s Summ. J. Mem. 16.  This plainly is incorrect: The Donnelly Deed of Trust represented additional security above and beyond the existing, underlying mortgage and therefore could form the basis for a tort claim under *Jacques* and *Parker.  Cf. Parker*, 604 A.2d at 534.

Proposal in Spring of 2012. *Id.* ¶ 12. The implication of these allegations was that BB&T had required Donnelly to execute the Donnelly Deed of Trust after the February 2012 Extension but before negotiating any further extensions.

The record now makes clear that Donnelly executed the Donnelly Deed of Trust as a precondition to the February 2012 Extension—which then was granted by BB&T. Plaintiffs expressly acknowledge this in their memorandum. Pls.' Summ. J. Opp'n 22 ("[Donnelly] was told that it was a condition for the extension of the Note set for signing on February 17, 2012 and that its execution was required for any future note modifications."). To the extent that the Donnelly Deed of Trust constituted additional consideration on par with the payment of an application fee in *Jacques*, BB&T fulfilled their obligations when they gave fair consideration to—and granted—an extension of the Note in February 2012. Donnelly has not identified any further commitments by BB&T to provide any additional extensions of the Loan, nor has he shown that BB&T did not exercise reasonable care in considering his proposal to curtail the Loan and reduce the monthly payments. The mere fact that BB&T did not grant Donnelly an extension cannot establish the breach of a duty where there was no obligation to do so. *Cf. Jacques*, 515 A.2d at 562 ("[O]rdinarily a proprietor may refuse to do business with a person for any reason except race, color, creed, or national origin.").

Implicit in Plaintiffs' claims is the premise that having executed the Donnelly Deed of Trust as a condition for any subsequent modifications created a tort duty that lasted indefinitely into the future life of the Loan—a duty without any apparent limitation, as Plaintiffs conceive it. But "[c]ourts have been exceedingly reluctant to find special circumstances sufficient to transform an ordinary contractual relationship between a bank and its customer into a fiduciary relationship or to impose any duties on the bank not found in the loan agreement." *Parker*, 604

A.2d at 532; *see also Spaulding v. Wells Fargo Bank, N.A.*, 714 F.3d 769, 778 (4th Cir. 2013) (same).  Even crediting Steffen's claim that Taylor stated that BB&T was "in for the long haul" (whatever that means), Steffen Dep. (Pls.' Excerpts) 100:9, Pls.' Summ. J. Opp'n Ex. 11, ECF No. 54-3, that ambiguous statement was no more than an expression of desire that the parties continue to have future dealings, and therefore cannot form a basis for liability, *see Miller v. Fairchild Indus., Inc.*, 629 A.2d 1293, 1304 (Md. Ct. Spec. App. 1993).  Plaintiffs cannot point to any application fee or other additional consideration demanded by BB&T and provided by them with respect to the proposed modification agreement, and Taylor's vague statement does not provide a sufficient basis to obligate BB&T to continue approving loan modifications indefinitely absent any consideration from Plaintiffs.

Plaintiffs also argue that, by having Donnelly deal with Taylor as "the key person who dealt with troubled loans and borrowers under 'financial stress'" instead of Sucher, with whom he had a longstanding relationship, imposed upon BB&T on an obligation "beyond simply processing the underlying loan documents."  Pls.' Summ. J. Opp'n 21.  Yet Plaintiffs do not offer any explanation or legal authority for this position and I cannot see how BB&T's decision as to who would be Plaintiffs' point of contact possibly can affect their duties to Plaintiffs under the Note.  Whatever the grounds for this argument, it does not support a tort duty for negligence.[6] BB&T was subject to the same obligations irrespective of who was acting as its agent with respect to Plaintiffs.

Although BB&T may have had a tort duty to consider the February 2012 Modification in good faith, there is nothing in the record to show that they did not do so and, in fact, BB&T

---

[6] However, to the extent that Plaintiffs appear to rest this argument on the nature of authority held or represented by Taylor, that is relevant to Plaintiffs claim for negligent misrepresentation, as discussed *infra*.

granted the modification at that time.  Having done so, the Donnelly Deed of Trust does not

create a perpetual tort duty, nor is there any basis to find that BB&T did not give proper

consideration to the modification proposal in the spring of 2012 in any event.  Accordingly,

BB&T owed no general negligence duty with respect to the Modification Proposal and is entitled

to summary judgment with respect to Plaintiffs' negligence claim.[7]

### C.  Negligent Misrepresentation

Negligent misrepresentation is a form of negligence recognized under Maryland law.

The seminal Maryland case on negligent misrepresentation is *Virginia Dare Stores v. Suchman*,

in which the Court of Appeals explained that an action for negligent misrepresentation "lies for

negligent words, recovery being permitted where one relies on statements of another, negligently

volunteering an erroneous opinion, intending that it be acted upon, and knowing that loss or

injury are likely to follow if it is acted upon." 1 A.2d 897, 899 (Md. 1938).  Under Maryland

law, negligent misrepresentation occurs where:

> (1) the defendant, owing a duty of care to the plaintiff, negligently asserts a false
> statement;
> (2) the defendant intends that his statement will be acted upon by the plaintiff;
> (3) the defendant has knowledge that the plaintiff will probably rely on the
> statement, which, if erroneous, will cause loss or injury;
> (4) the plaintiff, justifiably, takes action in reliance on the statement; and
> (5) the plaintiff suffers damage proximately caused by the defendant's negligence.

*Martens Chevrolet, Inc. v. Seney*, 439 A.2d 534, 539 (Md. 1982) (citing *Virginia Dare*, 1 A.2d

897).

As with a negligence claim arising out of a contract, courts have looked closely at

whether a duty exists as a prerequisite to allowing a claim for negligent misrepresentation.  But

---

[7] Because I find that Plaintiffs have not alleged a general tort duty owed by BB&T at all, there is
no need independently to address whether Plaintiffs had standing to assert a general negligence
claim.

notably, even where there is no special relationship sufficient to give rise to a general negligence duty, courts have found that a lender "had a duty to provide truthful information to Plaintiffs to maintain their mortgage in good standing," and that it can be a breach of that duty to provide incorrect or false information.  *See Neal v. Residential Credit Solutions, Inc.*, No. JKB-11-3707, 2013 WL 428675 (D. Md. Feb. 1, 2013).  And the Maryland Court of Appeals has recognized that a duty may be breached where a party makes negligent statements of fact in the context of important contract negotiations.  *See Weisman v. Connors*, 540 A.2d 783, 793 (Md. 1988).  "[T]he most common example of the duty to speak with reasonable care is based on a business or professional relationship, or one in which there is a pecuniary interest."  *Giant Food, Inc. v. Ice King, Inc.*, 536 A.2d 1182, 1185 (Md. Ct. Spec. App. 1988).

Here, Donnelly has provided an affidavit in which he states that, when he presented Taylor with the Modification Proposal (and after some negotiation over the details), Taylor told him that the proposal "would not be turned down" and that the "loan was a go."  Donnelly Aff. ¶ 8.  Steffen corroborates this with testimony that Taylor indicated that she "had loan approval" and the loan "was approved."  Steffen Dep. (Pls.' Excerpts) 133:11–12, 145:3.  However, because of Taylor's vacation plans, the settlement date for the modification could not be set until late-June 2012, over a month after the Note was to mature.  *See id.* ¶ 9.  This was consistent with past loan modifications in which the final modification was not signed until well after the Note had matured and no default had been declared.  *Compare* Loan Agreement, Def.'s Summ. J. Mem. Ex. 17, ECF No. 51-28 (maturing December 19, 2011), *with* Note Modification Agreement (executed February 17, 2012 and providing for payments to commence on January 19, 2012); *see also* Steffen Dep. 93:7–9 (Pls.' Excerpts) (acknowledging that "[t]he loan hadn't been paid at maturity").  And Steffen and Donnelly both have stated that they believed that

Taylor possessed the authority to speak on behalf of BB&T with respect to their loan modification.  *See* Donnelly Aff. ¶ 5; Steffen Dep. (Pls.' Excerpts) 110:17–20.  Based upon this testimony, a reasonable fact-finder could find that Taylor negligently misrepresented that the proposed Loan Modification had been approved under circumstances in which she knew or should have known that Plaintiffs would rely on that representation in allowing the Loan to go past its maturity date.  Though this is not so egregious as the conduct in *Neal*, where the plaintiffs deliberately missed payments based on their bank's instructions, it nevertheless is sufficient—if just barely—to show a duty to make accurate representations and a breach of that duty by Taylor and BB&T, whose agent Taylor was.  This particularly is so in light of the parties' history of informally working out loan extensions after the date on which the Loan had been set to mature, which left Solmons Two and Plaintiffs in a vulnerable position if, as happened here, BB&T were suddenly to deny a particular loan modification or restructuring.

This also is distinct from cases in which a mere "prediction" of one's future conduct was insufficient to support a claim for negligent misrepresentation.  *See Heritage Oldsmobile– Imports v. Volkswagen of Am., Inc.*, 264 F. Supp. 2d 282, 291 (D. Md. 2003) ("[A] representation regarding future conduct of the party making the representation, essentially a promise, is not actionable under a theory of negligent misrepresentation."); *cf. D & G Flooring, LLC v. Home Depot U.S.A., Inc.*, 346 F. Supp. 2d 818, 822 (D. Md. 2004) (a proposed future business agreement not memorialized in a later contract was not actionable notwithstanding plaintiff's reliance); *Miller v. Fairchild Indus., Inc.*, 629 A.2d 1293, 1304 (Md. Ct. Spec. App. 1993) (statements about future production were mere predictions and not negligent misrepresentations).  In essence, Plaintiffs are claiming that Taylor represented that the loan modification was satisfactory to the bank and that her approval was sufficient to approve it on behalf of BB&T.

Although settlement had yet to occur, Taylor's representations related to the present state of affairs—whether the Modification Proposal currently under consideration had been approved—and not about possible events in the indeterminate future.

It also appears that any assurances made by Taylor would have created a duty to Donnelly and Steffen personally, and not merely to Solomons Two. Although Plaintiffs' Opposition cites no case law and generates more heat than light on the issue of Plaintiffs' standing, they appear correct on the record currently before me in arguing that the Modification Proposal was negotiated on behalf of Plaintiffs and not merely on behalf of Solomons Two. *See* Pls.' Opp'n 15. Indeed, the Modification Proposal would not merely have provided additional time for Solomons Two to pay off the Loan, but would remove Solomons Two as the borrower and replace it with Plaintiffs directly, relieving McNelis and Erickson-File from the guaranty. *See* Donnelly Aff. ¶ 8. Thus Donnelly was not acting only as an agent of Solomons Two, but on his own behalf as well, and Taylor's duty to make accurate representations ran to Donnelly personally.[8]

BB&T responds, correctly, that "[t]here is not a single document authored by anyone associated with BB&T that would corroborate such a claim." Def.'s Summ. J. Mem. 23–24. But this is not decisive for purposes of summary judgment. Though at trial the fact-finder might find

---

[8] BB&T does not mention in its discussion of standing the fact that, after BB&T declared the Note to be in default, it reached a settlement with McNelis and Erickson-File that gave them the option to purchase the Note for less than its full value. *See* Settlement Agreement. But this suggests that the harms claimed by Donnelly and Steffen are not merely derivative of those suffered by Solmons Two, but are different from those suffered by the LLC itself or its other members. Though there is no indication that BB&T acted improperly in resolving its claims against some guarantors but not others and, in any event, Plaintiffs have not asserted any such claim against BB&T, this further supports the conclusion that any duty ran to Donnelly and Steffen specifically and not to all guarantors of Solomons Two equally in their capacity as guarantors.

Plaintiffs' testimony difficult to credit in light of their inability to marshal any documentary evidence to corroborate their subjective, self-serving recollection of events,[9] that is not the standard here.   The communications presented by the parties contain only optimistic statements that the modification was "in for approval" and Taylor was "optimistic," but there is nothing about these statements that contradicts Plaintiffs' testimony that, in other oral communications, Taylor represented that the loan was approved on her authority and the rest of the process was no more than a formality.[10]

It also is not decisive that Steffen could not recite specific terms that were provided by Taylor.   *See* Def.'s Summ. J. Reply 9.   Donnelly testified that the Modification Proposal contained definite terms, Donnelly Aff. ¶ 8, and it is clear from his communications that Donnelly believed that at least the major material terms of the modification had been agreed to, *see* Email from V. Charles Donnelly to Catherine Erickson-File et al. (June 29, 2012, 18:01 EDT) (referring to Taylor "mak[ing] this happen as she represented it would"); Letter from V. Charles Donnelly to Carol Taylor (July 9, 2012) (referring to "terms . . . that we discussed and agreed upon").   A fact-finder could conclude from this that BB&T had made representations about the nature of the modification that it would provide even if some of the terms had yet to be disclosed.

---

[9] This particularly is so in light of the fact that Steffen acknowledges having deleted relevant emails at a time when it is quite possible that she had a duty to preserve them. *See* Steffen Dep. (Pls.' Excerpts) 140:13–15.

[10] BB&T also relies on a clause in a loan agreement that requires any modifications to be in writing, Def.'s Summ. J. Mem. 23–24; Loan Agreement ¶ 10.05, as well as on Md. Code Ann., Cts. & Jud. Proc. § 5-408, which requires credit agreements to be in writing to be enforceable. However, Plaintiffs' negligent misrepresentation claim does not seek to enforce a supposed modification of the Loan that never occurred, but rather is pursuing damages arising out of BB&T's representations that the Loan would be modified and subsequent refusal to modify it. Accordingly, the requirement that any modifications be in writing does not bar Plaintiffs' tort claim.

BB&T also argues that Plaintiffs did not rely on Taylor's statements and, in any event, did not suffer any damages.  It is true that, during his deposition, Donnelly could not recall any specific opportunities that he had turned down or declined to pursue in reliance on BB&T.  *See* Donnelly Dep. (Def.'s Excerpts) 208:4–9.  But immediately after being told that BB&T would not agree to the Modification Proposal, Donnelly said that he "could have pursued options" had he been given additional notice.  Email from V. Charles Donnelly to Christine McNelis et al. (June 29, 2012, 18:01 EDT).  And as negotiations broke down between Plaintiffs and BB&T, Donnelly informed BB&T that he was working with another bank to enter into a replacement loan but would require up to sixty days to work out the details.  *See* Letter from V. Charles Donnelly to Carol Taylor (July 9, 2012).  Although the struggles that Plaintiffs were experiencing make it far from clear that they would, in fact, have been able to secure alternate sources of financing, particularly in the absence of specific, identifiable refinancing opportunities, it nevertheless is apparent that Plaintiffs would have had considerably more difficulty finding other opportunities in late-June 2012, after the Note had matured and BB&T had called the Note.  This is enough of a basis to create a triable issue regarding whether alternative financing could have been obtained elsewhere had BB&T not provided assurances that it would not be necessary until well after the Note had matured.

Similarly, although the damages enumerated by Plaintiffs appear highly optimistic and, with respect to recovery arising out of Solomons One, LLC, bordering on speculative, if not downright fanciful, *see* Pls.' Supp. Answer to Def.'s Interrog. No. 11, Def.'s Summ. J. Mem. Ex. 15, ECF No. 51-15, it is not difficult to see how Plaintiffs may succeed in demonstrating more than nominal damages if they can show the other elements of negligent misrepresentation.  After Plaintiffs were unable to refinance their mortgage, BB&T initiated a confessed judgment action

against them and foreclosure proceedings against the Property.  Although neither of those actions appears to have concluded, both expose Plaintiffs to the loss of their investment and substantial additional costs that may not have been accrued had Plaintiffs had the opportunity to pursue other financing options.[11]  And although other financing options likely would not have relieved Plaintiffs of any obligation to repay Solomons Two's debts or to avoid any consequences of their inability to do so, they nevertheless may have placed Plaintiffs in a better position than they now stand and allowed them to carry forward their investment.  Although BB&T is correct that Plaintiffs ultimately will have the burden to prove those damages at trial, the facts before me are sufficient to raise a genuine dispute as to damages.  This is a far cry from *Green v. Wells Fargo Bank, N.A.*, in which the plaintiffs merely alleged that a consumer might have taken unspecified action in reliance on the bank's representations; here, Donnelly has testified that he would have pursued other refinancing options that, if successful, would have prevented the foreclosure and confessed judgment actions from being filed and allowed Plaintiffs to carry forward their investment in the Property.  Nor is it decisive that Donnelly has not been able to secure additional financing options in the intervening time in light of the fact that the Property currently is in foreclosure and there is a confessed judgment action on the Note, both of which surely complicate any refinancing efforts.

That said, the mere fact that there are credibility issues in dispute, though just sufficient to survive summary judgment, does not suggest that Plaintiffs are likely to obtain the relief they appear to seek—to be relieved from their debts and allowed to continue their investment in the

---

[11]  Of course, because the $540,793.59 sought in the Confessed Judgment Action never was Plaintiffs' in the first instance, and rather indicates Plaintiffs' current liability for money that they cannot credibly deny that they still owe, it is difficult to see how that figure could be the proper measure of any damages owed to Plaintiffs.

Property free and clear—even were they to prevail despite the lack of documentary evidence to support their claims.

### D. Motion to Strike Jury Demand

BB&T also moves to strike Plaintiffs' jury demand, relying on jury trial waivers contained in the original Guaranty Agreement and in the 2010 Loan Agreement. *See* Def.'s Strike Mem. 2. As set forth above, the Guaranty Agreement unequivocally waives the right to a jury trial with respect to "ANY MATTERS OR CLAIMS ARISING OUT OF THIS GUARANTY . . . OR OUT OF THE CONDUCT OF THE RELATIONSHIP BETWEEN THE [GUARANTORS] AND THE BANK OR THE BORROWER AND THE BANK." Guaranty Agreement 2. The 2010 Loan Agreement contains a substantially identical Jury Waiver. 2010 Loan Agreement ¶ 10.19, Def.'s Strike Mem. Ex. 2, ECF No. 55-3. Judge Williams initially ruled that the facts in this case were insufficiently developed to resolve BB&T's initial motion to strike Plaintiffs' jury demand, and denied that motion without prejudice. *Donnelly*, 971 F. Supp. 2d at 509–10.

The facts now have been more fully developed fully and Plaintiffs' only arguments against the application of the Jury Waiver are that BB&T has given up its right to rely on the waiver by selling the Note and, in any event, the negotiations over the proposed refinancing are separate and apart from the underlying Loan. BB&T has not allowed its own failure to cite any law in support of its arguments to deter it from pointing out Plaintiffs' failure to do the same. *See* Def.'s Strike Reply 1. However, in light of the clear and broad nature of the jury waivers, Plaintiffs' failure to cite case law is fatal to their arguments. "Though the right to a jury trial under the Seventh Amendment is a fundamental one, it 'can be knowingly and intelligently waived by contract.'" *Mowbray v. Zumot*, 536 F. Supp. 2d 617, 620 (D. Md. 2008) (quoting

*Leasing Serv. Corp. v. Crane*, 804 F. 2d 828, 832 (4th Cir. 1986)).   Although BB&T likely was in a favorable bargaining position relative to Plaintiffs, *cf. Leasing Serv. Corp.*, 804 F.2d at 833, at least Donnelly is an attorney whose active role in negotiating the Loan for a piece of investment property shows that he is a relatively sophisticated party.   Nor have Plaintiffs made any specific argument that the waiver was not knowing or voluntary; they only argue that BB&T cannot invoke it in the context of the current dispute.   *See* Pls.' Strike Opp'n ¶ 2.

I am hard-pressed to see how negotiations over a restructuring of the Loan—even if those negotiations contemplated a wholly new note with a new set of rights and obligations—do not arise out of the relationship between Plaintiffs and BB&T.   Accordingly, those negotiations are within the scope of the Jury Waiver and Plaintiffs have provided no support to the contrary.   And while selling the Note might give rise to legal or equitable reasons to preclude BB&T from wielding certain of its provisions as a sword, Plaintiffs have provided no basis to deprive BB&T of the right to employ its bargained-for provisions as a shield where, as here, they have been haled into court by Plaintiffs for claims arising out of the parties' agreements.   Having disregarded the sale of the Note in bringing suit against BB&T rather than its assignee, Plaintiffs are equitably estopped from relying on the sale of the Note to prevent BB&T from invoking its provisions in its defense.   *See Mowbray*, 536 F. Supp. 2d at 622 ("To the extent that Mowbray seeks redress pursuant to the Guaranty Agreement, however, he is bound by the waiver contained in the Agreement of Sale. . . . Under the doctrine of equitable estoppel, [] Mowbray may not rely on the Agreement of Sale to establish liability while at the same time disclaiming the waiver provision contained in the same agreement.").   Accordingly, the jury demand must be struck.

**IV.      CONCLUSION**

For the aforementioned reasons, Defendant's Motion for Summary Judgment will be GRANTED with respect to Count I, and otherwise DENIED, and Defendant's Renewed Motion to Strike Jury Demand will be GRANTED.

A telephone conference call to discuss further proceedings will be scheduled in a future letter order.

A separate order shall issue.

Dated: <u>March 3, 2015</u>                          _____/S/_____

                                                   Paul W. Grimm
                                                   United States District Judge


dsy